SUN LAND & CATTLE CO., a corporation, and Fred E. Baker, an individual, Appellants (Defendants below),

v.

Lura A. BROWN, and Walter S. Brown, III, Leola P. Brown, Sheila Brown, and Sherille Brown, minors, by their next friend, Walter S. Brown, Jr., Appellees (Plaintiffs below),

Walter S. Brown, Jr., (Plaintiff below).

No. 3235.

Supreme Court of Wyoming.

July 24, 1964.

Brooke Wunnicke and Thomas A. Fennell of Williams, Wunnicke & Fennell, Cheyenne, for appellant.

Paul B. Godfrey of Henderson, Godfrey, Kline & Uchner, Cheyenne, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Sun Land & Cattle Co. and Fred E. Baker have appealed from a judgment rendered against them on a jury verdict, in an action for personal injuries resulting from a collision between a pickup truck owned by Sun and driven by Baker and an automobile in which all of the appellees were passengers.

The appeal of Sun questions whether there was sufficient evidence for the jury to have found that Baker, an employee of Sun, was acting within the scope of his employment at the time of the accident. Also, Sun and Baker both claim the verdict in question was irregular and should be set aside, because it was the result of the application of a mathematical formula by the jury.

Walter S. Brown, Jr., driver of the automobile, was a coplaintiff with the five appellees, all of whom are members of his family and were passengers in his vehicle at the time of the collision. The jury found against driver-Brown and awarded him no damages. His appeal from the judgment denying his claim for damages has been dismissed for procedural deficiencies. See Sun Land & Cattle Co. v. Brown, Wyo., 387 P.2d 1004.

## Scope of Employment

Turning our attention to the sufficiency of the evidence with respect to the question as to whether Baker was acting within the scope of his employment so that Sun could be held for his negligence, we will say at the outset that we think the record reveals sufficient evidence to support the finding of the jury on that issue.

In order to illustrate why we come to this conclusion, we will refer to some of the evidence favorable to such a finding, disregarding for the most part self-serving statements offered at the trial in behalf of Sun, especially where such statements conflict with evidence more favorable to the successful parties—appellees.

Admittedly, Baker himself and one of his employers testified that Baker's use of the truck at the time of the accident was not authorized and was not in the course of his employment, but such testimony was not conclusive nor binding on the jury.

The duties of Baker were described by himself and by Bernard Sun, his superior, as that of a caretaker and maintenance man on the Turkey Track Ranch. It was about 18 or 20 miles north of Lamont. Baker and his wife were the only persons living at that ranch, and Baker's duties included irrigating and fixing fences. He rode a horse and kept poachers off the place. Bernard Sun said he was to break horses and to "cowboy."

The evidence seemed to establish without contradiction that Baker used a saddle belonging to himself in the performance of those duties. This saddle had been left at Bairoil on the day previous to the accident. On the day of the accident, having nothing else particularly to do, as it would appear from Baker's testimony, he drove to Bairoil to get the saddle. He testified he ordinarily kept it at the Turkey Track Ranch and could have used it. On the way back to the Turkey Track Ranch, the collision with Brown's vehicle occurred in the vicinity of Lamont.

No other reason for the trip to Bairoil was given, and the jury was amply justified in concluding from this evidence that the saddle and hence the trip to get the

saddle were connected with Baker's employment. Additionally, it is clear from the testimony of Bernard Sun that the pick-up being driven by Baker carried halters, rope, wire stretchers, hammer, fence pliers, and other ranching equipment belonging to Sun, when the collision took place.

Appellant Sun points to testimony on the part of Baker to the effect that he went after his own saddle in order to sell the saddle. It is argued that this statement stands uncontradicted and must therefore be accepted as true. We cannot agree that the jury was bound to accept the statement as true, nor to find for Sun even if it were true.

■ The rule adhered to by most appellate courts, and observed by this court, is that where a verdict and judgment are claimed to be contrary to or not supported by the evidence, only the evidence most favorable to the successful party, together with all inferences reasonably drawn therefrom, may be considered, and conflicting evidence of the unsuccessful party must be disregarded. Oeland v. Neuman Transit Company, Wyo., 365 P.2d 806, 808. See also Brasel & Sims Construction Co. v. Neuman Transit Co., Inc., Wyo., 378 P.2d 501, 503; and Trails Motors v. First National Bank of Laramie, 76 Wyo. 152, 301 P.2d 775, 780. Or, as stated in Strom v. Felton, 76 Wyo. 370, 302 P.2d 917, 920–921, for the purpose of determining the validity of the judgment, we consider only the evidence and inferences favorable to the party for whom the judgment was rendered. See 5 C.J.S. Appeal & Error § 1564 (6), pp. 1286–1287.

In the case at bar, Baker's testimony established, in his own words, that he kept a horse; that he rode often, practically every day; that he rode to fix fences, check gates, run poachers off and "stuff like that"; and that he broke horses. In general, he did cowboy work and used a rope and horse and saddle in the business. As to whether any saddle except his own saddle was available for this work, Baker's testimony was itself contradictory. He testified there was an old saddle belonging to Sun which he never used. Then he testified he had used it and could use it.

Concerning the trip to Lamont on the day of his accident, the jury could reasonably infer he went after the saddle to bring it to the Turkey Track Ranch and use it there. He was asked why he had not waited until the next Sunday, and the following testimony was given:

"A. Well, I just got it in my head before that, that I wanted that saddle before somebody else got it, or got away with it.

"Q. And use it on the ranch also? A. Well, I could, yes."

Baker had taken the saddle to Bairoil on the day before, supposedly to sell it to a man by the name of Freeman. He found that Freeman had bought a new saddle and was not interested. The Baker saddle was left, as Baker explained, because he forgot it. There was no suggestion that it was left for the purpose of selling to anybody else. As Baker related what he did on the day of the accident, he testified, "I had a saddle at Lamont and I decided to go get it, at Bairoil, Freeman's"; and at another time, "I went to Freeman's to get my saddle." From Freeman's place, he said he went to see George Tully.

All of this testimony was given by Baker without any implication at all that his trip was made to pick up the saddle for the purpose of selling it. In fact, he testified specifically that the saddle was ordinarily kept right at the Turkey Track. This together with extensive testimony of use at the Turkey Track Ranch would leave a reasonable inference that the principal purpose of the trip was to go get the saddle and bring it back to the Turkey Track place and use it as it had been used.

■ It is true that later on Baker added a statement in his testimony to the effect that he tried to sell a saddle to Tully, and on redirect examination by his own attorney, who was also attorney for Sun, he said his purpose was to pick up the saddle

and see if he could not sell it to Tully. Of course, the evidence must be considered as a whole, however, and not on the basis of any single statement. So considered, a reasonable inference is, as we have just said, that the *principal purpose* of the trip was to get the saddle, bring it to the Turkey Track place and use it there.

If Baker had wanted to sell the saddle as he claimed, it was because he had a better saddle in mind, which he would have purchased in lieu thereof. The reasonable implication of this testimony would be that only an exchange of saddles would have been involved in any event, and that the new saddle in that case would have been used in lieu of Baker's first saddle. Either way, the jury could reasonably find that the purposes of Sun would be served.

It is not denied that Baker continued working as before for Sun until eighteen months after the accident. Although no question was asked on the subject, the inference is present from other testimony that he actually used the saddle here involved during that time.

Both Bernard Sun and Baker told of the pickup being turned over to Baker for use when a car of his own broke down and he and his wife were left with no transportation. Thereafter, according to at least one witness, Baker frequently drove the pickup to the Lamont area—about once or twice a week. The jury might well infer from the circumstances under which the pickup was turned over to Baker; from the manner in which he actually used it; and from the manner in which he was left on the Turkey Track Ranch without direct supervision, that his use of the vehicle for such purposes as picking up a saddle which was kept and used on the ranch was an authorized use.

Our court indicated in its opinion in Husted v. French Creek Ranch, Inc., 79 Wyo. 307, 333 P.2d 948, 951, that when an employee is acting in the line of his employment and is driving a vehicle which is being properly used in company service at the time of a collision, the doctrine of *respondeat superior* will be invoked, making the company liable for the negligence of its employee.

No doubt the evidence in the case at bar was such that the jury could have found for or against the proposition that Baker was acting in the line of his employment. It found, after that precise question was submitted on instructions of the court, that he was serving the purposes of Sun at the time of the accident. We cannot say as a matter of law that he was not.

■ It is only when conduct of an employee is shown clearly to be either within or without the scope of his employment that its effect on the employer's liability can be determined as a matter of law. Chalmers v. Harris Motors, Inc., 104 N.H. 111, 179 A.2d 447, 451; Claxton v. Page, 190 Okl. 422, 124 P.2d 977, 979.

■ In all cases where an employee relationship is admitted and employer's ownership of the vehicle is admitted, as in the instant case, a jury question is presented with respect to the employer's liability for negligence of its employee, if there is substantial evidence from which it may reasonably be inferred that the employee was acting within the scope of his employment. Fore v. McMillian, Okl., 272 P.2d 1036, 1038; Smith v. Leber, 34 Wash.2d 611, 209 P.2d 297, 304; Loper v. Morrison, 23 Cal.2d 600, 145 P.2d 1, 3-4.

### Regularity of Verdict

The reason assigned by Sun and Baker for setting aside the verdict of the jury is that each plaintiff awarded damages was given damages equal to exactly one-third of the amount claimed. Appellants argue that a verdict is invalid if it is arrived at by merely making a mathematical calculation rather than exercising judgment and weighing and considering the evidence.

The only case called to our attention in support of the proposition that this verdict should be set aside is a 1925 case from North Carolina, Daniel v. Belhaven, 189 N.C. 181, 126 S.E. 421. In that case, several plaintiffs were claiming damages for obstructing the flow of water and causing

it to be ponded on their several tracts of land. In the margin of the verdict the jury had written, "The jury agrees that each man shall be paid 30 per cent. of his claim."

The North Carolina Supreme Court upheld the trial court in setting aside the verdict, saying there seemed to be no practical distinction between a case in which the jurors agree to accept one-twelfth of the aggregate amount of their several estimates "without further deliberation" and a case in which they agree arbitrarily to award 30 percent of the plaintiffs' demands, apparently without due regard to the evidence in each case.

In effect appellants argue to us that the case at bar is similar to the case where jurors arrive at their verdict by taking one-twelfth of the aggregate amounts which each juror would allow. But we think the appellants overlook what the correct rule is with respect to a verdict which is attacked as a quotient verdict.

■ A good statement of such rule seems to be stated in 89 C.J.S. Trial § 472, pp. 113–114. It is to the effect that the test to be applied in determining the validity of a quotient verdict is whether the jury agreed "beforehand" to be bound by the result reached, since it is not the mere arriving at the average of the jurors' opinions as to the amount of damage which makes the quotient verdict bad, but the vice consists in an agreement by the jurors to be bound by the result of the addition and division, thus allowing the quotient whatever it may be to stand without subsequent reconsideration. If, however, there is no agreement that the average estimate shall be binding, and the averaging is done merely for the purpose of arriving at a working basis which the jurors are to be free to accept or reject as they see fit, a verdict subsequently agreed to is binding, whether it be for the average or for some other amount.

For cases which have followed such a rule see the following: Blevins v. Al Weingart Truck & Tractor Service, Inc., 186

Kan. 258, 349 P.2d 896, 901–902; Foster v. City of Augusta, 174 Kan. 324, 256 P.2d 121, 125; Ehalt v. McCarthy, 104 Utah 110, 138 P.2d 639, 647; Will v. Southern Pac. Co., 18 Cal.2d 468, 116 P.2d 44, 49; Wiles v. Northern Pac. Ry. Co., 66 Wash. 337, 119 P. 810, 812.

■ We are shown no reason for believing the jurors in the instant case agreed beforehand to award each claimant one-third of the damages prayed for, without regard to the evidence in each case. The fact that the same attorneys represented all of the plaintiffs would make it understandable that there could be a common relationship in each case between the amount of actual damages and the amount prayed for.

If we assume, which we must do, that jurors are capable of determining *actual damages*, then it would be possible for a juror to discover from the evidence in a given case that those preparing the complaints had consistently requested damages for three times the amount of actual damages. From ought that appears in the record of this case, a juror may have proposed, as a working basis, a verdict for each plaintiff entitled to damages, in the amount of one-third of the sum asked.

In the absence of anything in the record to indicate otherwise, we must assume all jurors were free to accept or reject the proposal of one-third, whenever and however it happened to be proposed, and we must also assume the one-third figure for each plaintiff was subsequently considered by the full jury, after it was proposed, in the light of the evidence pertaining to the damage suffered by each party.

There being sufficient evidence from which the jury could find that Baker was acting within the scope of his employment at the time of his collision with the Brown vehicle, and there being no evidence of misconduct on the part of the jury in arriving at its verdict, we conclude the judgment of the district court should be affirmed.

Affirmed.

Mr. Justice GRAY concurring in part and dissenting in part.

I concur in the holding that the record does not sustain appellants' claim that the verdict was invalid because of an irregularity appearing on its face. However, I am unable to agree with the holding that there was substantial evidence to support the special finding of the jury that the accident here occurred at a time when Baker, the employee, was using the pickup within the scope of his employment.

Difficult as it may be under circumstances such as are present in the instant case for plaintiffs to establish by competent evidence more than the relationship of employer-employee, it is plaintiffs' burden, nevertheless, to go further and establish by a preponderance of the evidence that the vehicle "was being properly used in company service at the time of the collision." Husted v. French Creek Ranch, Inc., 79 Wyo. 307, 333 P.2d 948, 951; 9C Blashfield, Cyclopedia of Automobile Law and Practice, § 6136, pp. 139–140 (Perm.Ed.); 8 Am.Jur.2d, Automobiles and Highway Traffic, § 617, p. 168. To me, plaintiffs have not met that burden.

As I view it, the only basis upon which the special finding mentioned above can rest evolves around the saddle. Even assuming that there was evidence from which the jury could infer permission on the part of Sun Land & Cattle Co. to Baker for personal use of the vehicle, that did not of itself subject Sun to liability. In Restatement (Second), Agency 2d § 238, p. 527 (1958), it is stated:

"* * * The master is liable only when the instrumentality is being used by the servant for the purpose of advancing the employer's business or interests, as distinguished from the private affairs of the servant. * * *"

See also McCauley v. Steward, 63 Ariz. 524, 164 P.2d 465; Gibbons & Reed Co. v. Howard, 129 Colo. 262, 269 P.2d 701; Barnett v. Inland Motor Freight, 44 Wash.2d 619, 269 P.2d 592. It was necessary further to show that Baker's mission for recovery of his own saddle, in some fashion or other, served at least a dual purpose, i. e., that of Sun as well as his own. Standard Oil Co. v. Smith, 56 Wyo. 537, 111 P.2d 132, 135.

Turning to the evidence pertaining to the saddle, it is shown that on occasion Baker used the saddle in his employment. However, Baker was furnished a saddle by Sun for use in his work. There is no evidence that such saddle was unfit for use or that Sun even knew Baker was using his own saddle, much less requiring it to be done. Under the circumstances it seems to me that any benefit received by Sun from Baker's preference for his own saddle was so nebulous and inconsequential that it was without evidentiary value in determining the issue on the scope of employment. The use was no more reasonably related to his employment than the proverbial sack of "Bull-Durham" that is a part and parcel of Wyoming cowboy lore, or the rifle in the Barnett case. There is a further reason for reaching the same result. The testimony of Baker with respect to the purpose of his trip is uncontroverted and uncontradicted. His purpose was twofold: 1. To retrieve his saddle, which was left on the fence at the rodeo grounds on Sunday. 2. To sell the saddle. It occurs to me that any inference which might have been drawn from recovery of the saddle as serving a purpose of Sun was entirely negated by his preconceived plan to sell the saddle on the same trip because he needed the money.

In my view, when Baker left the ranch at 11 a. m. on the morning of the accident, after having finished his duties for the day, he took off on a venture of his own wholly outside the scope of his employment. As a matter of law, Sun was relieved of liability for Baker's negligence during that venture. 8 Am.Jur.2d, Automobiles and Highway Traffic, § 618.

I would reverse the judgment.